**[PUBLISH]**

# IN THE UNITED STATES COURT OF APPEALS

## FOR THE ELEVENTH CIRCUIT
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
NOV 5, 2002
THOMAS K. KAHN
CLERK

No. 01-15117
_____

D.C. Docket No. 00-07557-CV-ASG

BROWARD GARDENS TENANTS
ASSOCIATION, BERNARD HOLMES,
LILLARD HOLMES, BETTY JOYCE
TORRENCE,

Plaintiffs-Appellants,

versus

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, CHRISTINE
TODD WHITMAN, in her official capacity
as Administrator of the United States
Environmental Protection Agency,
CAROL M. BROWNER, individually, JOHN
HANKINSON, individually and in his official
capacity as Regional Director, Region IV,
of the United States Environmental
Protection Agency, CITY OF FORT
LAUDERDALE, a municipality, UNITED
STATES DEPARTMENT OF HOUSING
AND URBAN DEVELOPMENT, et al.,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(November 5, 2002)

Before CARNES, HILL and KRAVITCH, Circuit Judges.

CARNES, Circuit Judge:

This case involves the cleanup of the Wingate Superfund Site, a sixty acre stretch of land that became contaminated with hazardous waste as a result of the City of Ft. Lauderdale's operation of a landfill and incinerators on the property. The Broward Gardens housing complex, situated about one-fourth of a mile from the Wingate site, was constructed during the City's operation of the landfill. After the City and other parties implemented a cleanup plan for Wingate pursuant to a consent decree, the Broward Gardens Tenants Association and various residents of Broward Gardens sued the United States Environmental Protection Agency, the United States Department of Housing and Urban Development, various federal officials, and the City, alleging numerous deficiencies in the cleanup plan.

The district court dismissed the complaint for lack of subject matter jurisdiction pursuant to section 113(h) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), which prohibits

2

federal judicial review of challenges to CERCLA cleanups except where necessary

to decide a claim that falls within one of five statutory exceptions.  On appeal,

plaintiffs do not assert that their claims fit within any of these statutory exceptions

to the section 113(h) bar, but instead contend that section 113(h) does not apply to

begin with, because:  (1) their complaint is not a "challenge" to the Wingate

cleanup within the meaning of section 113(h); and (2) section 113(h) does not

apply to constitutional claims anyway.  We disagree with both contentions and

affirm the district court's dismissal for lack of subject matter jurisdiction.

## I.  BACKGROUND FACTS AND PROCEDURAL HISTORY

The plaintiffs' complaint alleges the following historical facts, which we

accept as true for purposes of this review.  See Shands Teaching Hosp. and Clinics,

Inc. v. Beech St. Corp., 208 F.3d 1308, 1310 (11th Cir. 2000).  In 1951, the City of

Fort Lauderdale acquired the piece of land that would later become known as the

Wingate Superfund Site.  From 1954 until 1978, the City used the property to

operate a landfill and incinerators, causing it to become contaminated with, among

other things, arsenic and dioxin. The City never conducted a health study of the site

during all those years of operation.

Broward Gardens is a housing complex located approximately one-fourth of

a mile from Wingate.  Ninety-nine percent of  Broward Gardens' tenants are

3

African-American. A private developer planned the complex in the 1970s, and HUD insured the mortgage. HUD also subsidizes the rents for units leased to low income persons.

In 1989, pursuant to section 105 of CERCLA, 42 U.S.C. § 9605, which provides for the establishment of a national contingency plan for the removal of hazardous substances, EPA conducted initial studies of Wingate and added it to the National Priorities List (NPL), a list of hazardous waste sites for which the cleanup was a high priority. A year after Wingate was added to the NPL, the Florida Department of Health conducted a preliminary study which demonstrated that cancer levels in Broward County were higher in the areas surrounding Wingate than in any other part of the county.

After conducting studies of Wingate and soliciting public comment, EPA developed, pursuant to CERCLA, a proposed remedial plan for the site's cleanup.[1] In 1996, EPA issued a Record of Decision in which it presented the remedial action it had selected. That selected remedy included: (1) construction of a synthetic or clay cap with erosion controls over the landfill; (2) excavation of contaminated soil and incinerator ash, and disposal on the on site landfill; (3)

---

[1]CERCLA grants EPA the authority to remove or arrange for the removal of hazardous substances in the event of a release or threatened release of such substances into the environment. See 42 U.S.C. § 9604(a)(1).

drainage, treatment, and disposal of water in Lake Stupid;[2] (4) excavation of Lake Stupid sediments, and disposal on the on site landfill; (5) storm water management; (6) construction of a vertical barrier between the landfill and Rock Pit Lake; (7) natural attenuation for the surface water at Rock Pit Lake; (8) decontamination of the buildings and structures; (9) monitoring of ground water, surface water, sediment, and fish tissue; (10) institutional controls and/or ground water use restrictions within the current site boundary; and (11) institutional controls for the maintenance of the site cap, storm water controls, fencing, and signs.

The Record of Decision states that "[t]he selected remedy is protective of human health and the environment, complies with Federal and State requirements that are legally applicable or relevant and appropriate to the remedial action, and is cost effective." The Florida Department of Environmental Protection, after reviewing the plan, advised EPA of its concerns including the fact that that the plan ignored the state's cancer risk cleanup level for arsenic. EPA chose not to incorporate that risk cleanup level for arsenic into the proposed cleanup plan for Wingate.

---

[2]The name of this body of water is unusual enough to warrant an etymological note. The Record of Decision reveals that it is a cooling water pond which, because of the buildup of ash, lost permeability. Hence the name.

After negotiating with the City and other potentially responsible parties (PRPs)[3] over who would fund and implement the selected remedial action, EPA formulated a proposed consent decree for the cleanup of Wingate. Under the proposed decree, the City and other settling parties would finance and perform the remedial action for Wingate as set out in the Record of Decision and the appendix to the decree. That remedial action was essentially the same as the EPA's proposed remedial plan, which we have already outlined.

Pursuant to section 122 of CERCLA, EPA submitted the proposed consent decree to the United States District Court for the Southern District of Florida, United States v. City of Ft. Lauderdale (S.D. Fla. Civ. No. 98-6982), and it was made available for public comment. Various groups such as the Legal Aid Services of Broward County, Inc. and the Legal Environmental Assistance Foundation (LEAF) submitted comments expressing their concerns that: (1) the proposed remedial action did not require as much soil cleanup as Florida law did, and for that reason the site would never be removed from the NPL list; and (2) the proposed remedial action did not assure protection of human health from the arsenic and dioxin contamination.

---

[3]PRPs include certain present and past site owners and operators and generators and transporters of hazardous substances. See 42 U.S.C. § 9607(a).

At the end of the thirty-day comment period, EPA moved for entry of the decree. Some people who were not parties but who lived close to Wingate appeared to challenge the proposed remedy and oppose the motion to enter the decree. The district court found that those non-parties did not have standing and, on December 28, 1999, entered the decree. United States v. City of Ft. Lauderdale, 81 F. Supp. 2d 1348 (S.D. Fla. 1999). The non-parties to the decree did not attempt to appeal the court's standing determination or anything else.

After the cleanup of Wingate commenced, the Broward Gardens Tenants Association and various residents of Broward Gardens filed a complaint against EPA, HUD, various federal officials, and the City. It alleges that Broward Gardens was established as part of an overall plan to racially segregate Ft. Lauderdale, with the knowledge that the tenants would be exposed to hazardous substances. The complaint also alleges that the cleanup plan for Wingate is inadequate and that the site continues to expose plaintiffs to hazardous substances such as dioxin and arsenic.[4] By implementing the inadequate cleanup plan, the complaint contends, defendants were perpetuating de jure segregation.

---

[4]The complaint's claims include not only the objections to Wingate's remedial plan that the various non-parties had raised in opposition to the consent decree, but also objections to the plan's "cap and leave" remedy, which entails covering the contaminated area with a plastic cap. The complaint requests that the consent decree be vacated and revised to eliminate the use of the plastic cap, which is what was allegedly done at the Stauffer Chemical Superfund Site in Tarpon Springs, Florida, an area which allegedly is approximately ninety-three percent white.

The complaint sets forth seven counts based on various constitutional and statutory provisions. Count I alleges a violation of the Fifth Amendment by EPA; count II alleges a violation of the Thirteenth Amendment and 42 U.S.C. § 1982 by the City; count III alleges a violation of the Fourteenth Amendment and 42 U.S.C. § 1983 by the City; count IV alleges a violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq., by the City; count V alleges a violation of Title VIII of the Civil Rights Act of 1968, 42 U.S.C. § 3601 et seq., by EPA and various EPA officials; count VI alleges a violation of the Fair Housing Act, 42 U.S.C. §§ 3604 et seq. by HUD and a named HUD official; and count VII alleges a violation of the Fifth Amendment by the EPA officials.

The complaint requests various forms of declaratory and injunctive relief, including that the court:

> 7. Order the Defendants promptly to take effective action to disestablish the continuing de jure segregation of Broward Gardens and the conditions, features, and effects of that segregation, including the continued isolation and exposure of Broward Gardens to contamination, and industrial and other adverse land use conditions;

> ***

> 8. Order that the Defendants promptly take effective action to disestablish the continuing de jure segregation of Broward Gardens by adopting and implementing the state's stricter standards in the remedial plan for Wingate, including the elimination of the "cap and mound" method;

> ***

8

10.  Grant such other relief as may be just and appropriate.

The defendants filed  motions to dismiss asserting, among other things, that the district court lacked subject matter jurisdiction over the case because of section 113(h) of CERCLA, which limits a federal court's jurisdiction to hear challenges to cleanups undertaken pursuant to CERCLA until those cleanups have been completed. The court agreed, granting the motions to dismiss the claim pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction.

Specifically, the district court concluded that the complaint is a "challenge" to the cleanup plan at Wingate and that therefore section 113(h) applied.  Because it was undisputed that the cleanup of Wingate had not yet been completed, the court concluded that the complaint is barred by the plain language of section 113(h).  It rejected plaintiffs' contention that their constitutional claims could nevertheless proceed, concluding that section 113(h) makes no exception for constitutional claims.[5]

## II.  DISCUSSION

[5]Prior to the district court's order granting defendants' motions to dismiss, the plaintiffs also filed a motion for leave to amend the complaint.  The district court never accepted the amended complaint, and denied all pending motions as moot in its order granting defendants' motions to dismiss.  Other than the addition of various defendants and plaintiffs, the amended complaint is essentially identical to the original complaint, and for that reason the propriety of the district court's action in regard to the proffered amendments does not enter into our analysis.

9

CERCLA sets forth a comprehensive scheme for the cleanup of hazardous waste sites. As part of that scheme, section 104 of the Act gives EPA the authority to undertake response actions where there is a release or threatened release of hazardous substances. 42 U.S.C. § 9604. Response actions fall into two categories: removal actions which include actions to study and clean up contamination, and remedial actions which are "those actions consistent with permanent remedy taken instead of or in addition to removal actions." 42 U.S.C. § 9601(23), (24). CERCLA also gives EPA authority to issue administrative orders for certain persons to undertake response actions themselves or to file suit seeking federal court orders to the same effect. 42 U.S.C. § 9606(a). Under section 122 of CERCLA, EPA can negotiate settlement agreements with PRPs, in some cases for issuance by the district court as consent decrees. 42 U.S.C. § 9622.

In 1986, Congress amended CERCLA by adding section 113(h), which, with five enumerated exceptions, denies federal courts jurisdiction to hear challenges to both removal and remedial actions taken under CERCLA until those actions are complete. 42 U.S.C. § 9613(h). Entitled "Timing of review," section 113(h) provides that:

> No Federal court shall have jurisdiction under Federal law other than under section 1332 of Title 28 (relating to diversity of citizenship jurisdiction) or under State law which is applicable or relevant and appropriate under section 9621 of this title (relating to cleanup

10

standards) to review any challenges to removal or remedial action selected under section 9604 of this title, or to review any order issued under section 9606(a) of this title, in any action except one of the following:

(1) An action under section 9607 of this title to recover response costs or damages for contribution.
(2) An action to enforce an order issued under section 9606(a) of this title or to recover a penalty for violation of such order.
(3) An action for reimbursement under section 9606(b)(2) of this title.
(4) An action under section 9659 of this title (relating to citizens suits) alleging that the removal or remedial action taken under section 9604 of this title or secured under section 9606 of this title was in violation of any requirement of this chapter.  Such an action may not be brought with regard to a removal where a remedial action is to be undertaken at the site.
(5) An action under section 9606 of this title in which the United States has moved to compel a remedial action.

42 U.S.C. § 9613(h)(1)-(5).

Plaintiffs do not dispute that the cleanup of Wingate is "a remedial action selected under section 9604" of CERCLA, nor do they dispute that section 113(h) bars federal judicial review of certain challenges to an ongoing CERCLA cleanup such as the one at Wingate until the cleanup is completed.  Instead, they contend that their complaint is not a "challenge" to the Wingate cleanup, and therefore falls outside the scope of section 113(h).  Alternatively, plaintiffs contend that CERCLA's ban against judicial review of ongoing cleanup plans does not apply to

11

their constitutional claims.[6] We review de novo the court's grant of defendants' motions to dismiss for lack of subject matter jurisdiction. Ochran v. United States, 273 F.3d 1315, 1317 (11th Cir. 2001).

## A. IS THE COMPLAINT A "CHALLENGE" TO THE WINGATE REMEDIAL PLAN?

Plaintiffs first attempt to circumvent the 113(h) bar by insisting that their complaint does not really "challenge" the remedial plan for Wingate, as set forth in the consent decree.[7] A suit challenges a remedial action within the meaning of 113(h) if it interferes with the implementation of a CERCLA remedy. See Costner v. URS Consultants, Inc., 153 F.3d 667, 675 (8th Cir. 1998). To determine whether a suit interferes with, and thus challenges, a cleanup, courts look to see if the relief requested will impact the remedial action selected. For example, in

---

[6]Plaintiffs also contend that they are exempt from section 113(h) because they are an injured party instead of a PRP. They base the legal premise of that contention on legislative history indicating that Congress enacted section 113(h) in response to the growing number of lawsuits brought by PRPs against the government during cleanups in an attempt to delay having to pay the cost of those cleanups. A plain reading of the statute, however, indicates Congress' intent to preclude judicial review of challenges that call into question EPA's selected remedial or removal action regardless of the plaintiff's identity. If Congress had intended to except from the section 113(h) bar all claims brought by parties other than PRPs, it could easily have done so by adding a sixth exception to the five it provided in the statute.

[7]Technically, plaintiffs' position is that their suit does not challenge the consent decree, which in turn requires implementation of the cleanup plan selected by EPA in the Record of Decision. Section 113(h) speaks of challenges not to consent decrees but to removal or remedial actions selected by EPA. Nonetheless, because the consent decree implements EPA's selected remedial plan for Wingate, if the complaint challenges the consent decree it challenges EPA's selected remedial action.

12

McClellan Ecological Seepage Situation v. Perry, 47 F.3d 325 (9th Cir. 1995), the court, in holding that plaintiffs' citizen suit claims under the Resource Conservation and Recovery Act and the Clean Water Act were barred by section 113(h), held that vindication of those claims would create "new requirements for dealing with the inactive sites that are now subject to the CERCLA cleanup [and] clearly interfere with the cleanup." Id. at 329-30; see also Razore v. Tulalip Tribes of Washington, 66 F.3d 236, 239 (9th Cir. 1995) (holding no jurisdiction to entertain PRP citizen suit where suit, if successful, would "dictate specific remedial actions and . . . alter the method and order for cleanup," in violation of 113(h)); Alabama v. EPA, 871 F.2d 1548, 1559 (11th Cir. 1989) (holding complaint barred because it challenged the remedial action plan to the extent that it sought to enjoin EPA from participating in the shipment of wastes from a superfund site in Texas to Alabama and to prevent EPA from participating in any further remedial action at the site). Conversely, where a suit does not call into question the selected EPA remedial or removal plan, the suit is not a "challenge" under section 113(h). See Beck v. Atlantic Richfield Co., 62 F.3d 1240, 1243 (9th Cir. 1995) (holding that plaintiffs' action for compensatory damages but not injunctive relief could go forward, because "resolution of the damage claim would not involve altering the terms of the cleanup order").

13

As the district court concluded in this case, the plaintiffs' requests for relief seek to change the nature of the Wingate cleanup. The complaint seeks injunctive relief, including an order that defendants end exposure of Broward Gardens to contamination for the Wingate Superfund Site, and that they "adopt[] and implement[] the state's stricter standards in the remedial plan for Wingate, including the elimination of the 'cap and mound' method." Thus, the complaint asks the court to order the defendants to alter the remedial plan for Wingate. Because the complaint seeks to have the court modify or replace the remedial plan for Wingate, it clearly is a challenge to the selected remedial plan.

Plaintiffs and LEAF, as amicus curiae, counter that the complaint should be construed to seek the remedy of relocation, and argue that such a remedy is not a "challenge" to the remedial action that was selected by EPA and implemented by the consent decree. It is not clear that the complaint actually requests relocation as a remedy, but it does not matter. Assuming it is pleaded, the request for relocation constitutes a challenge to the cleanup. Congress specifically provided that relocation can constitute one of the measures of a remedial plan, 42 U.S.C. § 9601(24), which means that EPA could have incorporated relocation into Wingate's remedial plan, but chose not to do so. If the district court were to grant plaintiffs' relief in the form of relocation, the remedial action as set forth in the

14

consent decree would have to be altered to include relocation.  Asserting that a

remedial plan is inadequate because it fails to include a measure that it could have

included is challenging the plan for section 113(h) purposes.

LEAF contends that because the Broward Gardens Complex is located

outside the site's boundaries, and because the selected remedial plan does not

address lands and structures outside those boundaries, relocation of Broward

Gardens residents would have no impact on the selected remedial plan.  But, as we

have just pointed out, CERCLA expressly provides that relocation can constitute

one of the measures of a remedial plan.  42 U.S.C. § 9601(24).  Specifically, the

statute provides that the term "remedial action":

> includes the costs of permanent relocation of residents and businesses
> and community facilities where the President determines that, alone or
> in combination with other measures, such relocation is more cost-
> effective than and environmentally preferable to the transportation,
> storage, treatment, destruction, or secure disposition offsite of
> hazardous substances . . . .

Id.  Nothing in this statutory language suggests that EPA can order the relocation

of a building and its tenants only if they fall within the boundaries of the hazardous

waste site.  Moreover, the Senate Report on the bill from which § 9601(24)

originated provides that:

> a decision to provide permanent relocation may be based, at least in
> part, on findings from . . . health effects studies which . . . demonstrate
> that . . . even after remedial actions are taken, persons remaining in the

15

vicinity of the site would continue to be exposed to hazardous substances. . . .

S. Rep. No. 96-848, at 55. The fact that Broward Gardens is not located within the site's boundaries therefore does not have any bearing on EPA's authority to relocate the building complex's residents. To require relocation because of the proximity to a superfund site is to include relocation within the remedial measures that must be taken because of that site, and that would amount to an alteration of the Wingate remedial plan, which is another way of saying it would require a successful challenge of it. Successful challenges, as well as unsuccessful ones, and perhaps even more so, are forbidden by section 113(h) until the cleanup is complete.

## B. DOES SECTION 113(h) OF CERCLA APPLY TO CONSTITUTIONAL CLAIMS?

The second front of the plaintiffs' position in this court is the contention that section 113(h) does not bar constitutional challenges to a remedial plan, by which they mean challenges in the form of constitutional claims that the remedial plan violates one or more provisions of the Constitution. We have never clearly decided that precise issue. In Alabama v. EPA, 871 F.2d 1548 (11th Cir. 1989), plaintiffs claimed that EPA's failure to provide them with notice and a hearing before choosing a remedial action violated the Fifth Amendment as well as CERCLA. Id.

16

at 1554. We held that to the extent that plaintiffs' claims under CERCLA challenged the ongoing remedial action plan, section 113(h) barred federal jurisdiction. Id. at 1557-59. We dismissed plaintiffs' constitutional claims, however, for lack of standing, without discussing whether section 113(h) would have foreclosed federal judicial review of them as well while the cleanup was ongoing. Id. at 1556.

In Dickerson v. Adm'r, EPA, 834 F.2d 974 (11th Cir. 1987), we held that section 113(h) barred plaintiffs, who were owners of contaminated property, from obtaining a declaration of non-liability prior to a cost-recovery suit brought by EPA under CERCLA. Id. at 977-78. While the Dickerson opinion broadly states that "federal courts do not have subject matter jurisdiction for pre-enforcement reviews of EPA removal actions pursuant to section 9604," id. at 977, it does not specify whether plaintiffs' claims regarding their liability for costs incurred as a result of EPA's proposed response action were constitutionally or statutorily based.

The court in Dickerson did hold that CERCLA's bar on pre-enforcement judicial review does not violate a plaintiffs' due process rights, id. at 978 n.7, but that is not the same issue we face now – whether judicial review of constitutional challenges to a selected remedial plan is barred until the cleanup is completed. Thus, neither Dickerson nor Alabama v. EPA addresses whether challenges in the

17

form of constitutional claims against a selected remedial plan are outside the scope of section 113(h). We do so now.

As always, we begin our statutory interpretation with the language of the statute. Harris v. Garner, 216 F.3d 970, 972 (11th Cir. 2000) (en banc). When the import of the statute's language is clear, we need not resort to legislative history, and we never do so to undermine the plain meaning of clear statutory language. Id. at 976. "'When the words of the statute are unambiguous, . . . judicial inquiry is complete.'" Merritt v. Dillard Paper Co., 120 F.3d 1181, 1186 (11th Cir. 1997) (citation omitted). This is so, because "we must presume that Congress said what it meant and meant what it said." United States v. Steele, 147 F.3d 1316, 1318 (11th Cir. 1998) (en banc).

The language of section 113(h) does not distinguish between constitutional and statutory challenges; instead, it delays judicial review of "any" challenges to unfinished remedial action. In United States v. Gonzales, 520 U.S. 1, 117 S. Ct. 1032 (1997), the Supreme Court observed that "[r]ead naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'" Id. at 5, 117 S. Ct. at 1035 (quoting Webster's Third New Int'l Dictionary 97 (1976)). In its opinion in that case, the Court instructed that the word "any" must be read as referring to all that it describes. Id. Likewise, we have held that "the

18

adjective 'any' is not ambiguous; it has a well-established meaning." Merritt, 120

F.3d at 1186 (11th Cir. 1997). Because "'Congress did not add any language

limiting the breadth of that word,'. . . 'any' means all." Id. at 1186 (citation

omitted); see also CBS Inc. v. PrimeTime 24 Joint Venture, 245 F.3d 1217, 1223

(11th Cir. 2001). The use of the word "any" compels us to conclude that Congress

meant to bar jurisdiction over constitutional, as well as statutory claims challenging

the adequacy of a remedial plan.[8]

Our conclusion is in line with the Sixth Circuit's decision of the same issue.

Barmet Aluminum Corp. v. Reilly, 927 F.2d 289, 292-94 (6th Cir. 1991)

(concluding that section 113(h) applies to constitutional claims); see also Aztec

Minerals Corp. v. EPA, No. 98-1380, 1999 WL 969270, at *3 (10th Cir. Oct. 25,

1999) (unpublished) (holding that section 113(h) barred PRP plaintiffs' pre-

enforcement due process claim concerning EPA's regulation of a mine because the

claim did not come under any of the express statutory exceptions); South Macomb

---

[8]It is true that Congress must make its intent to preclude constitutional claims clear, Webster v. Doe, 486 U.S. 592, 603, 108 S. Ct. 2047, 2053-54 (1988), but here, Congress has used plain language to do that. For this reason, the canon of constitutional avoidance is inapplicable. See Public Citizen v. United States Dep't of Justice, 491 U.S. 440, 466, 109 S. Ct. 2558, 2573 (1989) (stating that the Court will not construe a statute to avoid constitutional problems where such a construction "'is plainly contrary to the intent of Congress'") (quoting Edward J. Departolo Corp. v. Fl. Gulf Coast Bldg. & Constr. Trades Council, 485 U.S. 568, 575, 108 S. Ct. 1392, 1397 (1988)); see also St. Martin Evangelical Lutheran Church v. South Dakota, 451, U.S. 772, 780, 101 S. Ct. 2142, 2147 (1981); NLRB v. Catholic Bishop of Chicago, 440 U.S. 490, 500-501, 99 S. Ct. 1313, 1318-19 (1979); Machinists v. Street, 367 U.S. 740, 749-750, 81 S. Ct. 1784, 1789-90 (1961).

Disposal Auth. v. United States EPA, 681 F. Supp. 1244, 1252 (E.D. Mich. 1988) (section 113(h) barred judicial review of pre-enforcement challenge to constitutionality of CERCLA); but see Washington Park Lead Comm., Inc. v. United States EPA, No. 2:98CV421, 1998 WL 1053712, at *9 (E.D. Va. Dec. 1, 1998) (unpublished) (citizens' constitutional challenge to administration of CERCLA not barred); Reeves Bros., Inc. v. United States E.P.A., 956 F. Supp. 665, 674-75 (W.D. Va. 1995) (holding that 9613(h) did not bar property owner's Fourth Amendment claim that EPA had adopted a policy of warrantless searches in carrying out CERCLA).

Plaintiffs say that "Congress could not have intended persons such as the Plaintiffs to wait years before they could commence an action raising constitutional claims of the magnitude of the Plaintiffs' claims, even if the issue of remediation is challenged." While we begin and end our statutory interpretation with the language of the statute where that language is unambiguous, the plain meaning of the statutory language does not control if it would lead to truly absurd results. See, e.g., Merritt, 120 F.3d at 1188 (stating that "the result produced by the plain meaning canon must be truly absurd before [the absurdity exception] trumps it"). CERCLA's general objective is to protect the public health and environment against improper disposal of hazardous wastes. See United States v. Bestfoods,

20

524 U.S. 51, 55, 118 S. Ct. 1876, 1881 (1998). Section 113(h) furthers that objective by preventing EPA remedial actions from being delayed by litigation. Given the litigiousness of our society, the virtually limitless ability of lawyers to construct constitutional challenges, and the protracted nature of litigation, it is not absurd for Congress to have assigned a higher priority to the prompt cleanup of a hazardous waste site than to the immediate adjudication of a claim challenging the remedial action. This is especially true given that Congress provided a way for the public to voice concerns through pre-remediation public review and comment procedures, assigned the states a role in the enforcement of the substantive standards established for remedial actions, and also left citizens the option of bringing a nuisance action in state court. Clinton County Commissioners v. United States EPA, 116 F.3d 1018, 1025 (3d. Cir. 1997) (en banc) (making this precise point). One could argue that there is tension between CERCLA's general objective of protecting the public and section 113(h)'s more specific objective of preventing delay in protecting the public, when a suit challenging a CERCLA cleanup alleges irreparable harm to human health unless the cleanup is altered. But as the Third Circuit has concluded, any arguable tension between a plain reading of the specific provisions of section 113(h) and

CERCLA's overall objectives cannot change the plain meaning of the statutory language. Id. at 1025 (stating that when the statutory language is clear, courts should not act as super-legislatures and second guess the policy choices of Congress). Because the result here is not absurd, the plain language controls.[9]

## III. CONCLUSION

The district court's motion to dismiss for lack of subject matter jurisdiction is affirmed.

AFFIRMED.[10]

---

[9]Until oral argument, plaintiffs never contended that Congress could not, consistent with the Constitution, withdraw or delay district court jurisdiction to hear constitutional claims. Their briefs discuss only what Congress intended, as opposed to what it could constitutionally do, when it passed section 113(h). Any argument that Congress lacks the authority to withdraw or suspend federal court jurisdiction over constitutional claims has been waived. See Allison v. McGhan Med. Corp., 184 F.3d 1300, 1317 n.17 (11th Cir. 1999) ("Issues that are not clearly outlined in an appellant's initial brief are deemed abandoned.").

[10]Nothing in our decision prevents these or any other plaintiffs from refiling this or a similar complaint once the cleanup at the site is completed. See generally Frey v. EPA, 270 F.3d 1129, 1133-34 (7th Cir. 2001). We need not decide what constitutes completion for these purposes, because plaintiffs have never contended that the cleanup was complete when they filed the complaint – and the allegations of the complaint indicate that it was not – and jurisdiction is to be determined based upon the facts as they existed at the time the complaint was filed. See, e.g., Damiano v. FDIC, 104 F.3d 328, 333 (11th Cir. 1997).