**SOUTH SIDE LANDFILL, INC., Landfill Management Co., Randolph Farms, Inc., Ralph and Mina Balkema, and John and Dorothy Balkema, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**No. 1:95–CV–220.**

United States District Court,
W.D. Michigan,
Southern Division.

Aug. 1, 2003.

Scott R. Sikkenga, Kalamazoo, MI, Theodore A. Schwartz, Damon R. Sedita, Montclair, NJ, for Plaintiffs.

Michael L. Shiparski, Grand Rapids, MI, Stephen T. Lyons, Washington, DC, for Defendant.

## *OPINION*

QUIST, District Judge.

Plaintiffs, South Side Landfill, Inc., Landfill Management Co., Randolph

Farms, Inc., Ralph and Mina Balkema, and John and Dorothy Balkema, filed this action against the United States ("Government" or "I.R.S.") pursuant to 26 U.S.C. § 7422 seeking a refund of taxes for the years 1989 to 1992. Each of the corporate plaintiffs owns and operates a landfill. Plaintiffs' refund claims depend upon the interpretation and application of Internal Revenue Code § 468, 26 U.S.C. § 468, which, among other things, allows landfill owners to take a current deduction for future closing and post-closing costs. In a prior Opinion and Order issued in this case, the Court held that pursuant to § 468(a)(2)(B), a taxpayer must include imputed interest in its reserve created pursuant to § 468(c)(2). *See S. Side Landfill, Inc. v. United States,* 52 F.Supp.2d 783, 787–88 (W.D.Mich.1999) (hereafter *"South Side I"*). The Government has now moved for partial summary judgment regarding another issue under § 468, namely, whether § 468(d)(2)(B)(ii) precludes Plaintiff South Side Landfill, Inc. from electing the benefits of § 468 as a result of the landfill's placement on the National Priorities List established under the National Contingency Plan of Section 105 of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), 42 U.S.C. § 9605.

### *Background*

Plaintiff South Side Landfill, Inc. ("SSL") owns and operates a landfill in Indiana (the "landfill"). In 1984, contractors for the United States Environmental Protection Agency ("EPA") conducted a site inspection at the landfill to obtain data for Hazard Ranking System scoring. (State Record of Decision at 3, Pls.' Br. Opp'n Ex. 1.) Sampling from on-site wells indicated the presence of some heavy metals in the ground water at the landfill. (*Id.* at 3–4.) Based upon that sampling and results from a 1981 survey of industrial waste disposal practices, the landfill was

scored and nominated for the National Priorities List ("NPL") in 1986. (*Id.* at 4.)

In 1985, SSL entered into an Agreed Order with the Indiana Department of Environmental Management ("IDEM"), pursuant to which SSL agreed to construct a slurry wall below grade and a leachate collection system to prevent potentially contaminated groundwater from escaping from the landfill and contaminating local groundwater supplies. The work on the slurry wall and leachate collection system was completed during the fall of 1988.

The landfill was added to the NPL on March 31, 1989. (*Id.* at 4.) Testing conducted prior to this time "generally showed no discernible contaminant plume or pattern of contamination that [could] be attributed directly to the landfill." (*Id.* at 8.) With regard to metals, the testing indicated that the level of metals in the groundwater was below primary maximum contaminant levels and that the only metals that exceeded secondary maximum contaminant levels were iron and manganese, found in wells both upgradient and downgradient of the landfill. (*Id.*) Although tests conducted in 1985 revealed levels of chromium and silver exceeding maximum contaminant levels, the source of these metals was determined to be further east and northeast of the landfill. (*Id.*) In 1989, after completion of the slurry wall and leachate containment system, IDEM conducted another sampling. An analysis showed that most metal levels were lower and that the silver and chromium detected in the prior sampling were not present. (*Id.* at 8.) Sampling of the leachate from inside the slurry wall indicated "a relatively weak-strength leachate" with maximum contaminant levels comparable to those set for drinking water. (*Id.* at 10.)

On or about September 14, 1995, IDEM issued its Record of Decision, in which IDEM concluded that with the remedial

measures of the slurry wall and leachate containment system in place, the landfill did "not pose [an] unacceptable risk to the environment and human health" and "no further action" at the landfill was required. (*Id.* at 2.) On July 3, 1997, the landfill was delisted from the NPL.

In its present motion, the Government contends that SSL is prohibited from taking a deduction under § 468 for the tax years in question by § 468(d)(2)(B)(ii), which bars a taxpayer from taking a deduction under § 468 for any property listed in the National Contingency Plan established under Section 105 of CERCLA.

### Discussion

Section 468 grants landfill operators a special deduction for site reclamation and closing costs. Federal and state laws and regulations impose certain closure obligations upon landfill operators, such as construction and maintenance of a final cap and monitoring of leachate from the disposal site. To comply with these requirements, landfill operators must incur significant expense, often for many years after the operations at the disposal site and the related income stream have ceased. In order to bridge the gap between receipt of income and expenditures for closing costs and to ensure that sufficient funds are available to pay for such costs, Congress enacted § 468, which allows landfill operators who use the accrual method of accounting to deduct a pro-rata portion of future closing and post-closing costs, calculated on a current basis, equal to the capacity of the landfill consumed during the taxable year.

The operation of § 468 was fully discussed in the Court's prior Opinion. Section 468 provides an exception to the economic performance rule set forth in 28 U.S.C. § 461(h)(1), which provides that an accrual method taxpayer may deduct an item only when all events have occurred that determine the fact and amount of

liability with reasonable accuracy. *South Side I*, 52 F.Supp.2d at 785. Pursuant to § 468, a landfill operator may elect to deduct reasonably estimated "qualified closing costs." *Id.* Taxpayers electing to deduct qualified closing costs under § 468 must add the amount of each annual deduction to a separate reserve maintained for the particular site. 26 U.S.C. § 468(a)(2)(D); *see South Side I*, 52 F.Supp.2d at 785. The reserve must also be adjusted to account for payments actually made during the taxable year for qualified closing costs (a decrease), 26 U.S.C. § 468(a)(2)(C), and for interest earned on the reserve funds (an increase), 26 U.S.C. § 468(a)(2)(B); *South Side I*, 52 F.Supp.2d at 785. If the reserve amount at the end of the year exceeds the current costs to close the landfill, the taxpayer must report the excess in income for that year. 26 U.S.C. § 468(a)(4)(B).

The amount of the deduction allowable in any taxable year for qualified closing costs is "equal to the current ... closing costs allocable to ... the production from the reserve property during such taxable year." 26 U.S.C. § 468(a)(1)(B). The term "current closing costs" is defined as "the amount which the taxpayer would be required to pay for qualified closing costs if the closing activities were performed currently." 26 U.S.C. § 468(d)(1)(B)(i). Current closing costs for a solid waste disposal site are computed on a "unit of capacity method." 26 U.S.C. § 468(d)(1)(B)(ii)(II). The term "qualified closing costs," as it relates to landfills, includes "[a]ny expenses incurred for any land reclamation or closing activity ... which is conducted in accordance with any permit issued pursuant to" the Solid Waste Disposal Act or "any other Federal, State, or local law which imposes requirements substantially similar to the requirements imposed by the Solid Waste Disposal Act." 26 U.S.C. § 468(d)(2)(B)(i). Finally, "re-

serve property" means "any property with respect to which a reserve is established under [§ 468(a)(1)]." 26 U.S.C. § 468(d)(4).

The issues presented in the instant motion are: (1) whether SSL is barred from taking a deduction pursuant to § 468 on or after March 31, 1989, the date the landfill was placed on the NPL; and (2) if SSL is so barred, whether SSL must include the balance in its § 468 reserve as income for the tax year in which the landfill was listed on the NPL.

## I. Does the Inclusion of the Landfill on the NPL Bar SSL from Taking a Deduction Under § 468?

■ For purposes of the first issue presented by the Government's motion, the pertinent statutory language, § 468(d)(2)(B)(ii), appears as an exception to the definition of "qualified closing costs":

**(2) Qualified reclamation or closing costs.** The term 'qualified reclamation or closings' means any of the following expenses:

. . . . . .

(B) Solid waste disposal and closing costs.

(i) In general. Any expenses incurred for any land reclamation or closing activity in connection with any solid waste disposal site which is conducted in accordance with any permit issued pursuant to—

(I) any provision of the Solid Waste Disposal Act (as in effect on January 1, 1984) requiring such activity, or

(II) any other Federal, State, or local law which imposes requirements substantially similar to the Solid Waste Disposal Act (as so in effect).

*(ii) Exception for certain hazardous waste sites. Clause (i) shall not apply to that portion of any property which is disturbed after the property is listed in the national contingency plan established under section 105 of [CERCLA].*

26 U.S.C. § 468(d)(2) (italics added). The Government contends that pursuant to § 468(d)(2)(B)(ii), SSL is precluded from taking a § 468 deduction for the 1989–92 tax years, when the landfill was listed on the NPL. SSL contends that the Government's argument must be rejected because the exception states that it applies only to "hazardous waste sites" and there are material issues of genuine fact regarding whether the landfill was a hazardous waste site.

This Court summarized the rules of statutory construction in *South Side I* as follows:

In construing the statute at issue, the Court must look first to the language used by Congress. *See American Tobacco Co. v. Patterson,* 456 U.S. 63, 68, 102 S.Ct. 1534, 1537, 71 L.Ed.2d 748 (1982). "A firmly established principle of statutory interpretation is that 'the words of statutes—including revenue acts—should be interpreted where possible in their ordinary, everyday senses.'" *Hanover Bank v. Commissioner,* 369 U.S. 672, 687, 82 S.Ct. 1080, 1089, 8 L.Ed.2d 187 (1962)(quoting *Crane v. Commissioner,* 331 U.S. 1, 6, 67 S.Ct. 1047, 1051, 91 L.Ed. 1301 (1947)). Ordinarily, the language used is presumed to reflect the legislative purpose of the statute. *American Tobacco Co.,* 456 U.S. at 68, 102 S.Ct. at 1537. "Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive." *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). Where the intent of Congress as expressed in unambiguous language of a statute is clear, a court need only apply

the language of the statute without examining legislative history. *See Chevron, U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). In addition, tax provisions granting deductions are "matter[s] of legislative grace" and must be strictly construed. *White v. United States,* 305 U.S. 281, 292, 59 S.Ct. 179, 184, 83 L.Ed. 172 (1938); *Helvering v. Northwest Steel Rolling Mills,* 311 U.S. 46, 49, 61 S.Ct. 109, 111, 85 L.Ed. 29 (1940).

52 F.Supp.2d at 787.

Section 468(d)(2)(B)(ii), by its plain language, precludes a taxpayer from taking a deduction for closing costs for any portion of property which has been disturbed after being "listed in the national contingency plan established under section 105 of [CERCLA]." While § 468(d)(2)(B)(ii) does not specifically refer to the NPL, Section 105(8) of CERCLA requires the President to revise the National Contingency Plan originally adopted pursuant to Section 311 of the Federal Water Pollution Control Act to reflect CERCLA's provisions. 42 U.S.C. § 9605(a). As part of that revision, the President must create a list of national hazardous waste sites, now known as the NPL, and rank them in order of priority for cleanup. 42 U.S.C. § 9605(a)(8)(B); *see Exxon Corp. v. Hunt,* 475 U.S. 355, 374, 106 S.Ct. 1103, 1115, 89 L.Ed.2d 364 (1986); *ARCO Envtl. v. Dep't of Health and Envtl. Quality,* 213 F.3d 1108, 1111 n. 2 (9th Cir.2000). In light of these requirements, the reference in § 468(d)(2)(B)(ii) to listing "in the national contingency plan" can be reasonably interpreted to refer to property listed on the NPL. The clear import of § 468(d)(2)(B)(ii) is that once property is listed on the NPL, no deduction for qualified closing costs may be taken for any portion of the property disturbed after the date the property becomes listed. The triggering event for § 468(d)(2)(B)(ii) is listing on the NPL.

Thus, it is evident from the statutory language that Congress intended the exception to preclude a deduction for qualified closing costs without regard to whether the taxpayer ever incurs response and remediation costs under CERCLA.

 SSL contends that regardless of a listing on the NPL, the exception applies only to hazardous waste sites. SSL's argument is based upon the heading of the subsection containing the exclusion, which states: "Exception for certain hazardous waste sites." It is well-established that headings in statutes are of limited use in statutory interpretation:

> [H]eadings and titles are not meant to take the place of the detailed provisions of the text. Nor are they necessarily designed to be a reference guide or a synopsis. Where the text is complicated and prolific, headings and titles can do not more than indicate the provisions in a most genral [sic] manner; to attempt to refer to each specific provision would often be ungainly as well as useless. As a result, matters in the text which deviate from those falling within the general pattern are frequently unreflected in the headings and titles. Factors of this type have led to the wise rule that the title of a statute and the heading of a section cannot limit the plain meaning of the text.

*Bhd. of R.R. Trainmen v. Balt. & Ohio Ry. Co.,* 331 U.S. 519, 528–29, 67 S.Ct. 1387, 1392, 91 L.Ed. 1646 (1947). *See also ASX Inv. Corp. v. Newton,* 183 F.3d 1265, 1268 n. 5 (11th Cir.1999) (stating that "we recognize that headings may not be used to limit the plain meaning of a statute or rule and generally are used as interpretive tools only when the text is ambiguous"). SSL's argument must be rejected, because there is nothing ambiguous about the text of the exception, which, to be operative, requires only that the landfill be listed on

the NPL. Moreover, the text and the heading, when considered together, show that the term "hazardous waste sites" was intended to refer to any property placed on the NPL rather than a subset of sites eligible for a § 468 deduction. *See Broward Gardens Tenants Ass'n v. United States EPA,* 311 F.3d 1066, 1068 (11th Cir.2002) (referring to the NPL as "a list of hazardous waste sites for which the cleanup was a high priority"); *Mead Corp. v. Browner,* 100 F.3d 152, 153 (D.C.Cir. 1996) (describing the NPL as "identifying high priorities among the nation's known hazardous waste sites"). Therefore, the placement of the landfill on the NPL in March 1989 is sufficient to invoke the exception in § 468(d)(2)(B)(ii).[1]

■ SSL also argues that the Government is not entitled to summary judgment on this issue because it has failed to carry its burden of demonstrating no genuine issue of material fact. SSL contends that the Government has not presented any evidence regarding the portion of the landfill that was disturbed after the landfill was listed on the NPL. The Court lacks jurisdiction to consider this argument. "[A] refund claim with the I.R.S. is a jurisdictional prerequisite to a refund action in federal district court." *Firsdon v. United States,* 95 F.3d 444, 446 (6th Cir.1996). As the Sixth Circuit has explained:

> The regulations promulgated pursuant to § 7422(a) state that "[t]he claim must set forth in detail each ground upon which a credit or refund is claimed and facts sufficient to apprise the Commissioner of the exact basis thereof." Treas. Reg. § 301.6402–2(b)(1). When a party fails to state with specificity the grounds for the refund, the court is

without jurisdiction to entertain the action. *See Salyersville Nat'l Bank v. United States,* 613 F.2d 650, 651 (6th Cir.1980). "Federal courts have no jurisdiction to entertain taxpayer allegations that impermissibly vary or augment the grounds originally specified by the taxpayer in the administrative refund claim." *Charter Co. v. United States,* 971 F.2d 1576, 1579 (11th Cir. 1992).

*McDonnell v. United States,* 180 F.3d 721, 722 (6th Cir.1999). The only ground SSL asserted in its claim for refund was that it was not a hazardous waste site. The claim that there is no evidence regarding the portion of the landfill disturbed after it was placed on the NPL is a different argument that was never presented for administrative review. Moreover, it is undisputed that the landfill was added to the NPL on March 31, 1989, and this is the only fact necessary for the Court to determine whether § 468(d)(2)(B)(ii) applies to SSL.

■ Finally, SSL contends that the exception should not apply to SSL because the landfill was improperly listed on the NPL. The Court is also without jurisdiction to consider this argument because SSL failed to raise it in its administrative claim for a refund. However, even if this ground were properly before the Court, whether the landfill was properly placed on the NPL is an issue which is irrelevant to this proceeding and over which this Court lacks jurisdiction to determine. By raising the argument that the landfill should not have been placed on the NPL, SSL is essentially asking this Court to review the EPA's decision in that regard. Section 113(a) of CERCLA provides: "Re-

---

1. The Government also relies upon the legislative history in a House Conference Report and the Joint Committee on Taxation's "General Explanation of the Revenue Provisions of the Deficit Reduction Act of 1984." Given

the unambiguous language of the statute, however, the Court finds it unnecessary to examine the legislative history with regard to the applicability of the exception in this case.

view of any regulation promulgated under this Act may be had upon application by any interested person only in the Circuit Court of Appeals of the United States for the District of Columbia." 42 U.S.C. § 9613(a). In addition, application for such review must be made within ninety days from the date of promulgation of the regulation. *Id.* "The designation of a hazardous waste site on the NPL is considered rulemaking subject to judicial review under 42 U.S.C. § 9613(a)." *Wash. State Dep't of Transp. v. United States EPA,* 917 F.2d 1309, 1311 (D.C.Cir.1990). This Court therefore lacks jurisdiction to determine whether the landfill was properly listed on the NPL, because the Circuit Court of Appeals for the District of Columbia is the proper forum for such a challenge. *United States v. Asarco Inc.,* 214 F.3d 1104, 1108 (9th Cir.2000).[2]

## II. Must SSL include the balance in its § 468 reserve balance as income for the tax year in which the landfill was listed on the NPL?

The second issue presented is whether SSL is required to include the entire balance of its § 468 reserve in its income for the year in which the landfill was placed on the NPL. In its principal brief, the Government argued that § 468(a)(5)(A) re-

quired such a result, because SSL's § 468 election was effectively revoked when it was placed on the NPL.[3] In its response brief, however, SSL, citing an IRS Field Service Advisory, pointed out that listing of the property on the NPL is not one of the events set forth in § 468(a)(5)(A) requiring inclusion of the reserve balance in income. In its reply brief, the Government conceded that § 468(a)(5)(A) does not apply to the circumstances in this case, but argued instead that § 468(a)(4) requires SSL to include the reserve balance in income at the end of the year in which the landfill was listed on the NPL.[4]

As noted, the Government relies on § 468(a)(4)(B), which requires a taxpayer to include in income any excess between the taxpayer's reserve for closing costs at the end of the year over the current cost to close that part of the landfill consumed since the § 468 election was made. Pursuant to § 468(a)(4)(C), the rule stated in § 468(a)(4)(B) must be applied after all adjustments to the reserve are made. The Government contends that where a waste disposal site has been placed on the NPL during the taxable year, the result is that the entire ending reserve balance must be included in income, because pursuant to § 468(d)(2)(B)(ii), current closing costs for

2. To the extent SSL's argument is premised upon fairness, the Court must reject it, essentially for the same reasons it rejected Plaintiffs' fairness arguments in *South Side I. See* 52 F.Supp.2d at 788. SSL's argument is that it was not a hazardous waste site and should not have been placed on the NPL. Even accepting that premise as true, SSL had available to it an adequate procedure for contesting its placement on the NPL, and there is no indication that Congress intended to establish an exception in tax refund cases for waste disposal sites improperly placed on the NPL.

3. Section 468(a)(5) provides that a taxpayer must include the balance of a reserve in income upon: (1) the revocation of a § 468 election; (2) completion of the closing of the

waste disposal site; or (3) disposition of any portion of the property by the taxpayer. 26 U.S.C. § 468(a)(5).

4. Although the Government conceded that the FSA was correct insofar as it concluded that § 468(a)(5) does not support its position, the Government also pointed out that pursuant to 26 U.S.C. § 6110(k)(3), such determinations may not be used or cited as precedent. Although courts have considered private rulings when interpreting Internal Revenue Code sections, *see Intermet Corp. v. Comm'r,* 209 F.3d 901, 907–08 (6th Cir.2000); *Thom v. United States,* 283 F.3d 939, 943 n. 6 (8th Cir.2002), the Court need not consider the FSA in light of the Government's concession that § 468(a)(5) does not support its position.

a disposal site listed on the NPL will always be zero.

 The Court disagrees with the Government's interpretation. Contrary to the Government's argument, § 468(d)(2)(B)(ii) does not say that the current closing costs for a disposal site listed on the NPL are automatically deemed to be zero. Rather, that section, which provides an exception to the definition of "qualified closing costs," i.e., what may be deducted, simply states that "qualified closing costs" do not include costs for "that portion of any property which is disturbed after the property is listed" on the NPL. Section 468(d)(2)(B)(ii) thus expressly recognizes that expenses incurred in the taxable year prior to the placement on the NPL remain deductible, and it does not suggest, nor can it be read to mean, that qualified closing costs (subject to appropriate adjustments) booked to the reserve in the months and years prior to placement on the NPL are automatically forfeited, as the Government contends. If Congress had intended that result, it could have easily said so, and likely would not have provided for a partial deduction of qualified closing costs for the portion of the taxable year prior to the time the disposal site was listed on the NPL. Moreover, the Government's argument attempts to shoe-horn a result into a section intended for other purposes. The Government asserts that § 468(a)(4) serves to recapture reserve balances for properties placed on the NPL, but, as the Government concedes, § 468(a)(5) defines the circumstances in which recapture is appropriate. Section 468(a)(4), the subsection on which the Government now relies, is concerned with reporting as income any portion of the reserve exceeding current closing costs.

Nothing in that subsection or elsewhere in § 468 suggests that current closing costs are zero for any property that has been listed on the NPL.[5]

The Government also contends that the result it urges is consistent with the legislative history of § 468, which states that recapture is required at the end of the tax year in which a disposal site is listed on the NPL. H.R. Conf. Rep. No. 98–861, at 882 (1984). However, in cases such as this, where the statutory language is clear, there is no need for a court to examine legislative history to determine congressional intent. *Ratzlaf v. United States,* 510 U.S. 135, 147–48, 114 S.Ct. 655, 662, 126 L.Ed.2d 615 (1994) ("[W]e do not resort to legislative history to cloud a statutory text that is clear."); *Audette v. Sullivan,* 19 F.3d 254, 256 (6th Cir.1994) (stating that "because the plain meaning of the statute is unambiguous, there is no need to examine the legislative history"). Accordingly, the Court rejects the Government's argument that § 468(a)(4) requires the inclusion of SSL's entire reserve in income for the 1989 taxable year and concludes that SSL's deduction for the 1989 taxable year is limited to that portion of the landfill disturbed prior to March 31, 1989.

### Conclusion

For the foregoing reasons, the Court will grant in part and deny in part the Government's motion for partial summary judgment.

An Order consistent with this Opinion will be entered.

### ORDER

In accordance with the Opinion filed this date,

---

5. It would seem that if Congress had actually intended to require recapture when a disposal site is placed on the NPL, it would have done so by a more direct means than by using the Government's proffered method of performing a calculation which always ends up as zero.

**IT IS HEREBY ORDERED** that the Government's Motion for Partial Summary Judgment (docket no. 53) is **GRANTED IN PART AND DENIED IN PART.** The motion is **granted** with respect to the issue of whether 26 U.S.C. § 468(d)(2)(B)(ii) applies to Plaintiff South Side Landfill as a result of its placement on the National Priorities List. The motion is **denied** with respect to the Government's argument that Plaintiff South Side Landfill's entire § 468 reserve must be included in income for the 1989 tax year. Therefore, closing and post-closing costs through March 31, 1989, remain an issue for trial.